

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00237-CR
No. 02-24-00238-CR

_____

ROMIE RICHARDSON, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 362nd District Court
Denton County, Texas
Trial Court Nos. F23-3731-362, F24-1463-362

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I. Introduction

A jury convicted Appellant Romie Richardson of the offense of burglary of a vehicle (enhanced by a prior conviction) and assessed his punishment for that offense at twenty years' confinement in the Institutional Division of the Texas Department of Criminal Justice and also assessed a $10,000 fine. *See* Tex. Penal Code Ann. § 30.04. The same jury convicted Appellant of unlawful possession of a firearm and assessed his punishment for that offense at twenty-five years' confinement in the Institutional Division of the Texas Department of Criminal Justice. *See id.* § 46.04. The trial court sentenced Appellant in accordance with the jury's recommendations.

Appellant has had three appointed appellate counsel. To complicate our review, Appellant's first appellate counsel filed an original brief raising two issues that challenged only the assessment of costs. After substitution of counsel, Appellant's third appellate counsel filed a supplemental brief raising a single issue claiming that Appellant had received ineffective assistance of counsel. Because the issue raised in the supplemental brief is an attack on Appellant's convictions, we will address it first.

We examine each of the deficiencies that Appellant identifies in his trial counsels' performance. But as we must, we analyze Appellant's ineffective-assistance claims not by an isolated examination of each alleged deficiency but in the context of the totality of the representation that he received. Further, our review examines whether, in reasonable probability, the deficiencies had such an impact on this case's outcome that

2

they undermine our confidence in the jury's guilty verdicts and the punishments that it assessed. Applying the applicable standards, we conclude that the alleged deficiencies in counsels' representation do not support a claim of ineffective assistance of counsel.

With respect to the cost issues raised in Appellant's original brief, we resolve those as follows:

- We delete an assessment of $55.00 in the bill of cost in case number F23-3731-362 for "Subpoena service fee."

- We reject Appellant's claim that he is immediately liable for costs because the district clerk has issued a bill of cost. For this reason, we reject the argument that the issuance of a bill of cost conflicts with a provision in the judgments that makes him liable to pay costs once released from confinement. We will modify the bills of cost to specify that they are not payable until Appellant's release from confinement.

## II. Factual and Procedural Background[1]

### A. We describe the setting of the alleged offenses.

The setting for the offenses is a large sports facility in Lewisville, Texas. The facility includes both baseball and soccer fields, as well as a number of separate parking lots.

### B. Witnesses testified about Appellant's burglarizing a vehicle.

The events at issue occurred on a hot May Saturday while a baseball tournament was being held at the sports facility. On that day, the fifteen-year-old sister of one of

---

[1]Appellant does not attack the sufficiency of the evidence supporting his convictions. But we detail the evidence as part of our analysis of whether his counsels' allegedly deficient performance had a reasonably probable impact on the jury's verdicts.

3

the baseball tournament's participants went to sit in her family's vehicle. The pickup truck owned by her brother's coach was parked ten yards away in such a way that it gave the girl a view of the driver's side of the vehicle. The girl noticed an individual who was acting suspiciously and who got out of a black BMW sport-utility vehicle. She described this person as a black male of average height, who was bald, had a scruffy beard, and was wearing a black shirt and red shorts. The male looked in the window of the coach's pickup, opened its door, entered the truck, and appeared to rummage around in it for a moment or two. The male then got out of the truck and appeared to be carrying a bottle of perfume; the girl said that he appeared to sniff the bottle that he was holding. The girl called her mother, who was watching her brother's game, and spoke to her and a couple of others. After the police were called, the girl recounted what she had seen to one of the responding officers.

One of the parents who was watching the game heard the girl's mother state that her daughter had reported that someone was in the coach's truck. The parent walked to the parking lot, spoke to the girl, and then located the BMW that the girl had identified. As the BMW was leaving the parking lot and after the girl had indicated that the parent was approaching the correct vehicle, the parent stopped the vehicle. The BMW's driver fit the description of the male that the girl had seen. The driver rolled down his window. The parent asked if he had been in a vehicle that he had not been driving, and without prompting, the driver asked if she meant a vehicle of the same type as the coach's. The BMW driver said that he had looked in but had not entered that

4

vehicle. As the BMW left the baseball-field parking lot, the parent took a picture of the vehicle's license plate. After the police arrived as a result of a 911 call, the parent provided officers with the picture that she had taken and a description of the individual that she had spoken to—a description that matched the one given by the girl.

The wife of the coach (who was a co-owner of the coach's truck) described examining the truck's interior after the reported event. Items were amiss: a blanket that had been placed over her purse had been moved, and a piece of paper that had been in the truck was on the ground. Not having given anyone permission to enter the truck, she called 911, and a recording of the call was played for the jury. During the call, she reported the license-plate number of the BMW, the driver's description, and its direction of travel. Appellant's lead counsel cross-examined the coach's wife and obtained the admission that though a perfume bottle could have been in the truck, she could not confirm that fact. Counsel also noted that he had repeatedly watched videos from the responding officers' body cams, and when officers later showed the coach's wife items that had been removed from Appellant's car, she did not identify any of them as having been removed from her truck.

### C. We set forth the testimony of the police officers who responded to the report of a burglary.

The first officer who responded to the 911 call contacted the witnesses, confirmed that a male had been involved in the burglary of vehicle, and obtained a description of the BMW and its driver. He found the BMW in a parking lot that served

5

the soccer fields at the sports facility. He relayed the vehicle's location to other responding officers and asked them to watch the vehicle.

The officer walked the soccer fields and saw an individual who matched the description given by the witnesses but who was now wearing a white shirt rather than a black one as described by the witnesses. Assuming that he knew the name of the owner of the BMW from running its license-plate number, the officer approached the individual fitting the description relayed to him. A forty-five-second excerpt from the officer's body cam depicting the encounter was played for the jury. The officer spoke with Appellant and asked if his name was Richardson; Appellant responded with a false name. The first officer then left the sports facility because of another call.

A training officer and his trainee officer also responded and remained on the scene after the first responding officer left. These officers spoke to the witnesses, obtained their descriptions of the individual who had entered the coach's truck, and then went to watch the already located BMW to see who returned to it. An individual matching the given description returned to the BMW, and the officers approached him.

The training officer recounted at trial that Appellant had initially told a story about refereeing a soccer game with a fraternity brother, but when the officers had Appellant call the fraternity brother, he said that he was in another city. Appellant then claimed that he was meeting a female whose child was playing soccer, but when pressed, he said that this person had not yet arrived. The officer described the purpose of the conversation as "[b]asically trying to give some validity or some -- you know, back up

6

his side of his story and ultimately find the truth of what [had] actually transpired." The officers also inquired if Appellant had accidentally entered the coach's truck, and Appellant described his conversation with the witness who had stopped him but said that he had not known what she was talking about. The officer also asked Appellant about having on a different colored shirt, and Appellant responded that he had changed his shirt because it was hot.

A four-and-a-half-minute excerpt from the training officer's body-cam video was published to the jury. The excerpt started when Appellant first approached his vehicle. The video showed the officers standing a distance from Appellant and speaking to him. Appellant was not handcuffed or restrained; he was holding his phone and was casually conversing with the officers. The trainee officer asked Appellant about his movements and why he was at the sports facility. Initially, Appellant said that he knew why he was being stopped—his encounter with the other officer. Appellant claimed that he was at the sports facility to meet his friend who was calling a game. The officer described to Appellant what the witnesses had reported. The training officer asked if Appellant had a conversation with a lady. Appellant responded that a lady had flagged him down and had asked if he had gotten in a vehicle; he denied having done that. Appellant said that "it was all crazy." The training officer asked why Appellant had been "over there" if he had meant to come "over here." Appellant responded that he did not know which

field he was supposed to go to. The officer then asked why Appellant was wearing a white shirt, and Appellant responded that it had gotten hot.[2]

The training officer testified that Appellant was ultimately placed under arrest. The officer also testified that Appellant was later charged with unlawful possession of a firearm.

Appellant's lead counsel cross-examined the officer in an effort to show that the arrest was the result of a rush to judgment. Specifically, the examination focused on the officer's failure to have the witnesses identify Appellant as the person who had entered the coach's truck.

The trainee officer was the next to testify. He described arriving at the sports facility, speaking with the witnesses, finding the BMW, and then waiting to see if the owner returned. He stated that shortly after finding the BMW, an individual who met the description given by the witnesses had approached the BMW. He also corroborated the training officer's testimony that Appellant had initially stated that he was there to referee a soccer game with a fraternity brother but that the fraternity brother had stated that he was in another city after officers had Appellant call him.

---

[2]Though Appellant's counsel initially stated that he had no objection to the admission of the video, he later lodged an objection that was apparently directed to the discussion regarding Appellant's changing shirts. The objection is chaotic, with counsel arguing that Appellant was not trying to interact with the officer, that the officer should have told Appellant that what he said could be used against him, and that the shirt discussion was irrelevant.

During the course of his conversation with Appellant, the officer decided that he had probable cause to arrest Appellant for burglary of a vehicle; his probable-cause determination was based on the facts that he "had his description[ and] the description of his vehicle. The totality of the circumstances that he presented to me just did not add up at that point."

The officer *Mirandized* Appellant. Appellant continued to speak with the officer. The officer searched Appellant's BMW and found several suspicious items, including a bottle of cologne. The officer also found two firearms in the BMW; Appellant said that they were not his.

Portions of the trainee officer's body-cam footage were also admitted, and several excerpts were played for the jury:

- In the first excerpt, the trainee officer asked if Appellant was refereeing a soccer game, and Appellant responded that his fraternity brother was. The officer asked if Appellant had the fraternity brother's phone number. Appellant then asked if the officer wanted him to call his fraternity brother. The officer asked Appellant to call his fraternity brother and have him come over to confirm his story. The officers said that they were giving Appellant an opportunity to establish his story and that they were not assuming anything. The officer told Appellant to put the person he was calling on speaker. When called, the fraternity brother said that he was in Dallas. At this point, Appellant was arrested, cuffed, and *Mirandized.* He continued to speak with the officers. When asked why his fraternity brother had failed to confirm his story, Appellant's story transitioned to one in which he was "out here f---ing around with this chick," and he said that her daughter was playing soccer. He then said that the woman was on her way.

- The next excerpt showed the officers beginning their search of Appellant's BMW and finding items, including a firearm and clothing with price tags attached.

- The third excerpt showed recovery of another firearm and a firearm's magazines.

- The final excerpt showed the officer re-*Mirandizing* Appellant and asking him where the firearms had come from. Appellant responded that they were not his and admitted that he is a convicted felon.

The officers then verified that Appellant had been convicted twice before for burglary of a vehicle.[3]

### D. The jury returned guilty verdicts.

The jury returned guilty verdicts on the charges of (1) burglary of a vehicle while having been previously convicted two or more times of an offense of burglary of a vehicle and (2) unlawful possession of a firearm.

### E. We summarize the punishment phase, the sentences assessed by the jury, and the judgments rendered by the trial court.

In the punishment phase, fourteen witnesses were called. The State's seven witnesses focused on Appellant's criminal history. Appellant's seven witnesses focused on the assertion that he was of fine character and was able to be rehabilitated. Appellant testified on his own behalf. Out of a penalty range of two to twenty years on the burglary conviction, the jury assessed punishment at confinement for twenty years. Out

---

[3]Another witness testified that one of the guns recovered had been taken from a vehicle that his wife had driven to a sporting event.

of a penalty range of twenty-five years to ninety-nine years or life on the firearm-possession charge, the jury assessed punishment at confinement for twenty-five years. The trial court signed judgments reflecting the jury's verdicts on guilt and punishment.

### F. We set forth Appellant's motion for new trial and summarize the hearing on that motion.

Appellant filed a motion for new trial based on the contention that he had received ineffective assistance of counsel. The motion itemized a number of claimed deficiencies in the representation that Appellant had received.[4]

---

[4]Specifically, the motion for new trial alleged the following:

8. This court should grant a new trial in these cases because [Appellant] received ineffective assistance of counsel. (*See* Declaration of [Appellant], attached and incorporated for all purposes).

    a. Trial counsel failed to contact, subpoena, and secure the testimony of witnesses whose testimony was material to the defense of these cases.

    b. Trial counsel refused to allow the testimony of other witnesses whose testimony was material to the defense of these cases.

    c. Trial counsel failed to call any witnesses or present any defense case. The State played on this during closing arguments, further harming [Appellant].

    d. Trial counsel failed to object to unlawfully obtained evidence.

    e. Trial counsel failed to correct a false impression left with the jury by the State's introduction of the body[-]cam evidence and the questions and answers asked to and given by witnesses regarding this evidence.

    f. Trial counsel failed to fully review the evidence prior to trial and was not prepared to defend these cases.

11

The trial court conducted a hearing on the motion for new trial. An affidavit from Appellant's lead counsel was admitted on behalf of the State. An affidavit from Appellant's co-counsel was admitted on behalf of the State and a declaration also authored by co-counsel was admitted on behalf of Appellant. Further, Appellant's lead counsel testified, and we will detail that testimony below. The trial court denied the motion for new trial on the record; no written order appears in the clerk's record.

### III. Analysis

**A.      We explain why we overrule Appellant's claim of ineffective assistance of counsel.**

Appellant's ineffective-assistance-of-counsel argument turns on two themes: inexperience and lack of preparation. There is no question about inexperience as both Appellant's lead and co-counsel acknowledged that this was their first felony trial. On the question of lack of preparation, Appellant's arguments mostly turn on disputed contentions that the trial court appears to have resolved contrary to Appellant's position. And for the most part, Appellant ignores that merely showing a deficiency in counsel's performance is only one step in the process; the second or prejudice prong of an ineffective-assistance claim is a true challenge to Appellant's argument in light of the

---

g.      Trial counsel failed to object to, correct, and/or counter misrepresentations and false impressions the State left with the jury that [Appellant] was having an extramarital affair.

h. Trial counsel failed to object to improper and irrelevant evidence and/or argument of counsel for the State.

strength of the evidence against him and the length of his criminal record. We will examine each of Appellant's underlying arguments in turn but ultimately conclude that Appellant's complaint turns a blind eye to the broad perspective that we must apply to Appellant's ineffective-assistance-of-counsel claim, and that perspective dictates that we overrule the claim.

### B.   We set forth the general principle governing a claim for ineffective assistance of counsel and the applicable standard of review.

The right to counsel and the general standard that representation must meet are as follows:

> The Sixth Amendment to the United States Constitution, and [S]ection [10] of Article [I] of the Texas Constitution, guarantee individuals the right to assistance of counsel in a criminal prosecution. The right to counsel requires more than the presence of a lawyer; it necessarily requires the right to effective assistance. However, the right does not provide a right to errorless counsel[] but rather to objectively reasonable representation.

*Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011) (footnotes omitted).

Texas analyzes a claim of ineffective assistance of counsel under the two-pronged analysis established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). *See Hernandez v. State*, 726 S.W.2d 53, 55–56 (Tex. Crim. App. 1986) (adopting *Strickland* analysis). The two prongs ask whether (1) counsel's representation fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense such that there is a reasonable probability that the result of the proceeding would have been different. *Id.* An appellant bears a preponderance-of-the-evidence burden of proof to establish both

13

prongs of the *Strickland* standard.  *Perez v. State*, 689 S.W.3d 369, 381 (Tex. App.—Corpus Christi–Edinburg 2024, no pet.) (citing *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)).

"In evaluating counsel's effectiveness under the deficient-performance prong, we review the totality of the representation and the particular circumstances of the case to determine whether counsel provided reasonable assistance under all the circumstances and prevailing professional norms at the time of the alleged error." *Rachal v. State*, 725 S.W.3d 152, 165 (Tex. App.—Fort Worth 2025, pet. filed).  A defendant is not entitled to "errorless or perfect counsel whose competency of representation is to be judged by hindsight." *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006).  Every effort must be made to "eliminate the distorting effects of hindsight." *Id.*  Our review is highly deferential, and we operate under a strong presumption that counsel's conduct was not deficient. *Id.*

Usually, direct appeal is a poor vehicle to analyze whether counsel's performance was deficient because we lack counsel's explanation for the course of action followed. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012); *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007).  Here, counsel testified at Appellant's motion-for-new-trial hearing with respect to certain aspects of his representation.

The second prong of *Strickland* creates a specific standard and provides the scope of what we must review in order to determine whether a defendant was prejudiced by counsel's deficient performance:

14

> Under the second prong of *Strickland*, a defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Thompson* . . . , 9 S.W.3d [at] 812 . . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* If the deficient performance might have affected a guilty verdict, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. *Miller v. State*, 548 S.W.3d 497, 499 (Tex. Crim. App. 2018)[ (op. on reh'g)]. An appellate court must examine the totality of the representation and the evidence in evaluating the effectiveness of counsel. *Thompson*, 9 S.W.3d at 813; *Miller*, 548 S.W.3d at 499. Failure to make the required showing of sufficient prejudice defeats an ineffectiveness claim. *Thompson*, 9 S.W.3d at 813.

*Johnson v. State*, 624 S.W.3d 579, 586 (Tex. Crim. App. 2021). Indeed, the prejudice prong of the *Strickland* analysis presents a higher standard of proof than the harm analysis found in the Texas Rules of Appellate Procedure. *Ex parte Martinez*, 330 S.W.3d 891, 903 (Tex. Crim. App. 2011) ("[T]he *Strickland* prejudice prong applied today presents a more difficult burden than does the harm analysis under Rule 44.2 of the Texas Rules of Appellate Procedure . . . ."); *see also Cruz v. State*, No. 06-24-00175-CR, 2025 WL 826885, at *1 (Tex. App.—Texarkana Mar. 17, 2025, no pet.) (mem. op., not designated for publication) (same).

In analyzing the prejudice prong, our review of the totality of the evidence asks whether the errors that counsel committed had a pervasive effect—an analysis that is understandably influenced by the strength of the evidence supporting a conviction. The Fourteenth Court of Appeals explained this principle as follows:

> This court must determine whether "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." [*Strickland*, 466 U.S. at

15

696, 104 S. Ct. at 2069]. In making this determination, we consider the totality of the evidence before the jury. *Id.* at 695, 104 S. Ct. [at 2069]. "Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Id.* at 695–96, 104 S. Ct. [at 2069]. A verdict "only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696, 104 S. Ct. [at 2069].

*Walker v. State*, 676 S.W.3d 213, 221 (Tex. App.—Houston [14th Dist.] 2023, pet. ref'd).

"Failure to succeed on either prong [of the *Strickland* test] is fatal to the ineffectiveness claim." *Ex parte Lane*, 670 S.W.3d 662, 671 (Tex. Crim. App. 2023). Thus, "[t]he two prongs of *Strickland* need not be analyzed in any particular order, and if a defendant fails to make the required showing in one, we need not address the other." *Rachal*, 725 S.W.3d at 165 (citing *Martinez*, 330 S.W.3d at 901).

Whether a party has met the two prongs of *Strickland* presents a mixed question of law and fact. *Masterson v. State*, 706 S.W.3d 468, 473 (Tex. App.—Austin 2024, no pet.) (citing *Strickland*, 466 U.S. at 698, 104 S. Ct. at 2070). Though speaking specifically to the prejudice prong of *Strickland*, the Court of Criminal Appeals recently offered a detailed explanation of how we review mixed questions of law and fact associated with a trial court's ruling on an ineffective-assistance-of-counsel claim raised by a motion for new trial:

> [Ineffective-assistance-of-counsel] prejudice is a mixed question of law and fact, and some questions of fact may turn on the credibility and demeanor of the witnesses who testify in the new-trial hearing. *Kober v. State*, 988 S.W.2d 230, 233 (Tex. Crim. App. 1999). Appellate courts should afford almost total deference to a trial court's determinations of those questions. *Id.* (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim.

16

App. 1997)). Mixed questions of law and fact that do not depend on an evaluation of credibility and demeanor may be reviewed [de novo]. *Guzman*, 955 S.W.2d at 89. Unless the trial court is in "'an appreciably better position' than the appellate court to decide the issue, the appellate court may independently determine the issue while affording deference to the trial court's findings on subsidiary factual questions." *Id.* (quoting *Villarreal v. State*, 935 S.W.2d 134, 139 (Tex. Crim. App. 1996) (McCormick, P.J., concurring)).

In reviewing the trial court's grant of [a]ppellee's motion for new trial, the court of appeals cited *Johnson v. State*, 169 S.W.3d 223, 239 (Tex. Crim. App. 2005)[,] for the proposition that the "ultimate question of whether prejudice existed is reviewed [de novo]." [*State v.*] *Hradek*, [No. 08-15-00342-CR,] 2023 WL 174878, at *81 [(Tex. App.—El Paso, Jan. 12, 2023) (substituted op.[ on reh'g], not designated for publication)]. But the court of appeals failed to include the rest of the standard articulated in *Johnson*: "While the ultimate question of prejudice under *Strickland* is to be reviewed [de novo], the trial court should be afforded deference on any underlying historical fact determinations." *Johnson*, 169 S.W.3d at 239.

*State v. Hradek*, 707 S.W.3d 384, 391–92 (Tex. Crim. App. 2024).

### C. We reject Appellant's claim that he received ineffective of assistance of counsel because no motion to suppress portions of the officers' body-cam videos was filed.

Appellant argues that lead counsel was ineffective for failing to file any pretrial motions. As Appellant notes, lead counsel testified that he had relied on motions filed by Appellant's prior counsel, including a motion in limine. And Appellant's actual complaint focuses on lead counsel's failure to file a motion to suppress the officers' body-cam videos or at least a part of them. Appellant ignores the burdens that he is required to carry to support this contention. Further, we disagree that the failure to file such a motion constitutes ineffective assistance of counsel under our record or that Appellant has shown that the failure to file such a motion prejudiced him.

As we discuss below, a pivotal question of whether failing to file a motion to suppress constitutes ineffective assistance is whether filing that motion would have been a futile act. Appellant makes a number of arguments that beg the question. To avoid facing this question, Appellant attempts to transmogrify the issue into one regarding whether lead counsel conducted a reasonable investigation. Appellant predicates his argument on the following facts and the assumptions that he draws from those facts:

- Lead counsel had no prior felony trial experience. From this fact, Appellant concludes that lead counsel lacked resources, such as a motions bank, that would have enabled him to file a motion to suppress.

- Lead counsel did not file any motions on behalf of Appellant but relied on the motion in limine filed by Appellant's prior counsel.

- Appellant claims that lead counsel did not access the body-cam videos until after the trial had started and that this fact is undisputed. We disagree with this characterization. First, it is based on an indecipherable exhibit that was attached to a business-records affidavit from a Denton County document manager, which Appellant claims recorded the date of the first time that counsel accessed the videos.[5] Further, lead counsel specifically testified that he had viewed the videos earlier than that date and that the problems he had referenced regarding accessing the videos related to a particular computer that he was using. Further, his cross-examination of witnesses included questions that were based on his review of the videos. We assume that the trial court—impliedly—resolved the question contrary to Appellant's position. *See State v. Sandifer*, No. 02-15-00307-CR, 2016 WL 7157249, at *4 (Tex. App.—Fort Worth Dec. 8, 2016, pet. ref'd)

---

[5]Though not referenced in Appellant's brief, co-counsel's declaration admitted at the new-trial hearing also claimed that lead counsel "did not receive the videos himself until the first day of trial." Lead counsel said that this was not true. Thus, the issue remained one of credibility for the trial court to resolve.

(mem. op., not designated for publication) (stating that "we will infer the necessary fact findings that would support the ruling if the evidence, viewed in the light most favorable to the ruling, supports those findings").

- Appellant argues that we must reject out of hand lead counsel's testimony that he considered but rejected filing a motion to suppress and even consulted with his mentor about the issue. In Appellant's view, we must reject the argument because lead counsel made a clumsy objection after one of the body-cam videos was admitted that suggested a suppression ground. By his failings, Appellant argues that counsel "failed to argue that Appellant was under a custodial interrogation when police detained him upon return to his vehicle and thus the statements should have been suppressed due to lack of [*Miranda*] [w]arnings."

But with all the criticisms of lead counsel in place that allegedly sullied his performance, Appellant's argument distills down to a claim based on one aspect of the body-cam videos that he claims should not have made its way to the jury:

> Appellant was denied the right to a just and fair trial because trial counsel's deficient representation ignored a major suppression issue. *As a result of Appellant's illegally procured statements, the prosecution effectively explained to the jury why Appellant's appearance did not match the witnesses' description.* The State was able to refute any misidentification defense and successfully tied Appellant to the alleged burglary of a vehicle. *Furthermore, Appellant's admission that he changed shirts resulted in his arrest and police were able to search Appellant's vehicle.* During the search, police found two firearms that resulted in additional charges. If trial counsel had properly filed and urged a [m]otion to [s]uppress, Appellant would have had a chance to suppress his statements, and the evidence found in the car would have been suppressed as fruit of the poisonous tree. *See Nardone v. United States*, 308 U.S. 338, 341[, 60 S. Ct. 266, 268] (1939)[.] [Emphases added.] [Record citations omitted.]

Appellant's broad criticism of his counsel and his specific complaint never references the exact standard that governs an ineffective-assistance-of-counsel claim predicated on a failure to file a motion to suppress. That standard encapsulates both

19

the burden that an appellant prove such a motion was more than a futile act and the context in which the failure must be viewed in order to show prejudice from the error:

> Trial counsel's failure to file a motion to suppress is not per se ineffective assistance of counsel. *Wert v. State*, 383 S.W.3d 747, 753 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 2587 (1986)). Counsel is not required to perform a useless or futile act. *See Ex parte Chandler*, 182 S.W.3d 350, 356 (Tex. Crim. App. 2005) ("But a reasonably competent counsel need not perform a useless or futile act."); *Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991) ("Counsel is not required to engage in the filing of futile motions."). Rather, to satisfy *Strickland* and prevail on an ineffective assistance claim based on defense counsel's failure to file a motion to suppress, the appellant must show by a preponderance of the evidence that the motion to suppress would have been granted and that the remaining evidence would have been insufficient to support his conviction. *See Wert*, 383 S.W.3d at 753 (citing *Jackson v. State*, 973 S.W.2d 954, 956–57 (Tex. Crim. App. 1998)).

*Dorsey v. State*, No. 01-14-00685-CR, 2015 WL 4591790, at *6 (Tex. App.—Houston [1st Dist.] July 30, 2015, no pet.) (mem. op., not designated for publication); *see also Tecum-Sajche v. State*, No. 09-23-00246-CR, 2025 WL 1819257, at *3 (Tex. App.—Beaumont July 2, 2025, no pet.) (mem. op., not designated for publication) (stating that "an appellant must show by a preponderance of the evidence that the result of the proceeding would have been different—i.e., that the motion to suppress would have been granted and that the remaining evidence would have been insufficient to support his conviction" in order to succeed on an ineffective-assistance claim based on counsel's failure to file a motion to suppress); *Guillory v. State*, No. 02-18-00428-CR, 2019 WL 2554242, at *18–19 (Tex. App.—Fort Worth June 20, 2019, no pet.) (per curiam) (mem. op., not designated for publication) (citing *Dorsey* as applicable standard). Appellant's

20

burden includes producing "evidence defeating the presumption of proper police conduct." *Tecum-Sajche*, 2025 WL 1819257, at *3.

Appellant contends that his statements were illegally obtained because he was not *Mirandized* before he made them. The warnings required by both *Miranda* and Code of Criminal Procedure Article 38.22 result from Appellant's being subject to a custodial interrogation. *See Wexler v. State*, 625 S.W.3d 162, 167 (Tex. Crim. App. 2021) (first citing *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 1630 (1966); and then citing Tex. Code Crim. Proc. Ann. art. 38.22). Appellant assumes, but never explains why, he was subject to a custodial interrogation requiring *Miranda* warnings.

Obviously, not every police encounter prompts an immediate need for *Miranda* warnings; the analysis of whether a custodial interrogation requires the warnings is complex:

> A custody determination requires two inquiries: the circumstances surrounding the interrogation and whether a reasonable person in those circumstances would have felt that she was not free to leave. *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, [465] (1995). "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test" to determine whether there was restraint on freedom of movement of a degree associated with arrest. *Id.* The ultimate inquiry is whether, under the circumstances, a reasonable person would have believed that her freedom of movement was restricted to the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, [1528] (1994); *Dowthitt* [*v. State*], 931 S.W.2d [244,] 254[ (Tex. Crim. App. 1996)]. The "reasonable person" standard presupposes an innocent person. *Dowthitt*, 931 S.W.2d at 254 (citing *Florida v. Bostick*, 501 U.S. 429, 438, 111 S. Ct. 2382, [2388] (1991)).
>
> *Dowthitt* outlined four general situations that may constitute custody: (1) the suspect is physically deprived of her freedom of action in

21

any significant way[;] (2) a law[-]enforcement officer tells the suspect that she cannot leave[;] (3) law[-]enforcement officers create a situation that would lead a reasonable person to believe her freedom of movement has been significantly restricted[;] or (4) there is probable cause to arrest, and law[-]enforcement officers do not tell the suspect that she is free to leave. 931 S.W.2d at 255.

For the first three situations, the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention. *Id.* For the fourth situation, the officer's knowledge of probable cause must be manifested to the suspect, and custody is established only if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe she is under restraint to a degree associated with an arrest. *Id.*; *Stansbury*, 511 U.S. at 325, 114 S. Ct. [at 1530]. An officer's subjective intent to arrest the suspect is irrelevant unless that intent is communicated or otherwise manifested to the suspect. *Dowthitt*, 931 S.W.2d at 254 (citing *Stansbury*, 511 U.S. at 324–25, 114 S. Ct. [at 1529–30)] (police knowledge or beliefs bear on the custody issue only if they are conveyed to the suspect)).

To evaluate whether a reasonable person in the suspect's situation would have felt that there was a restraint on her freedom to a degree associated with arrest, the record must establish the circumstances manifested to and experienced by her. *State v. Ortiz*, 382 S.W.3d 367[, 373] (Tex. Crim. App. 2012) ("[O]nly the objective circumstances known to the detainee should be considered in deciding what a reasonable person in his position would believe.")[; *s*]*ee also Thompson*, 516 U.S. at 113, 116 S. Ct. [at 466] ("[I]f encountered by a 'reasonable person,' would the identified circumstances add up to custody[.]"); *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S. Ct. 3138, [3151] (1984) ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.").

*Id.* at 167–68.

Here, three body-cam video excerpts were admitted. Appellant never explains how any of those revealed that he was undergoing a custodial interrogation until he was actually placed under arrest and *Mirandized*. Specifically, Appellant never explains how

22

"restriction upon freedom of [his] movement amount[ed] to the degree associated with an arrest as opposed to an investigative detention." *See id.* at 168. Indeed, one encounter is of the briefest duration with an officer asking Appellant his name, Appellant giving a false name, and the officer moving on. The other videos show the officers asking Appellant to explain his presence at the sports facility and to offer his side of the story. When Appellant's story—that he was refereeing with a fraternity brother—fell apart, he was arrested. Thus, Appellant never explains why the whole of the videos reveals a custodial interrogation that required the police to *Mirandize* him.

Instead, the focus of Appellant's argument is a small portion of the videos when the officer asked why he had changed shirts. This focus appears to be an effort to capitalize on lead counsel's failed attempt to object and keep this snippet from the jury—with the premise of the argument being that it was an implied acknowledgment that the statement should have been suppressed. No matter lead counsel's subjective belief, Appellant never explains from an objective standpoint why that statement should have been suppressed, i.e., he never explains why this question suddenly transitioned the situation from an investigative detention into a custodial one. Specifically, he never explains why the tenor of the question was different from those that preceded it (and which he does not challenge) when the officers were allowing Appellant to explain his presence at the sports facility and offer an innocent explanation for his interaction with the witnesses. So, even assuming that lead counsel's objection revealed his belief that

23

the snippet should have been suppressed, the fact of the objection does not translate into a conclusion that a motion to suppress would have been granted had it been filed.

Nor does Appellant confront the question of prejudice. Even if it were an error on lead counsel's part to have permitted the introduction of the question and response about the shirt change, Appellant ignores that he was also required to show that "the remaining evidence would have been insufficient to support his conviction." *See Dorsey*, 2015 WL 4591790, at *6. The attempt to avoid that analysis is understandable. The evidence stacked against the conclusion is as follows: the witnesses' descriptions of Appellant, his car, and its license-plate number; how Appellant matched the physical description given and his acknowledgement that he owned the car that the witnesses had described; Appellant's deception in giving a false name to the first officer that he encountered; and Appellant's ever evolving stories when speaking to the other officers, including the suspect explanation that he volunteered after being *Mirandized*. Indeed, Appellant placed himself at the location of the burglary when he acknowledged having spoken to the witness who confronted him when he was leaving the baseball-field parking lot. And from the body-cam videos, the jury could see that Appellant was no longer wearing a black shirt. The fact that the evidence (excluding the shirt-change question) is sufficient to support the jury's verdict on guilt is one that Appellant understandably avoids, but ignoring the question dooms his claim.

**D.** **We reject Appellant's claim that his counsel's statement that mentioned prior imprisonment and his counsel's questioning that mentioned warrants constituted ineffective assistance of counsel.**

24

In his next argument, Appellant claims that he received ineffective assistance because of his lead counsel's (1) argument that every interaction he had with police had led to his imprisonment and (2) cross-examination question to officers that acknowledged that Appellant had outstanding warrants. Considering the crimes with which Appellant was charged and his admissions, counsel's argument had a defensible strategic purpose. Further, the premise of Appellant's argument about warrants fails because his counsel did not acknowledge that Appellant had outstanding warrants.

Initially, Appellant attacks lead counsel's statement during opening statements that Appellant was deceptive when speaking with officers: "[H]e know [sic] his history is bad. Every interaction that he's had with a cop has led him to prison." In Appellant's view, this argument had no purpose because it introduced extraneous offenses and because "[r]ight off the bat, trial counsel was telling the jury that Appellant has had multiple prison trips."

Appellant ignores the context of his counsel's statement. The fact that Appellant had prior convictions was hardly a secret; he had been charged and was being tried as a felon in possession of a firearm. The jury was told that the burglary charge against Appellant was being enhanced by prior convictions. In a body-cam video excerpt that was played for the jury, Appellant admitted, after being *Mirandized*, that he was a felon. It was easy to anticipate that an officer would testify—as one did—that he had run Appellant's criminal history and had verified that he was a convicted felon.

25

Initially, lead counsel's theme wove in a claim that Appellant's arrest was hasty by arguing that Appellant was arrested in this case because of an inadequate investigation. And knowing what was already before the jury and what was coming, lead counsel acknowledged the obvious: Appellant had prior convictions. The challenged statement was an effort to give the jury an alternative explanation for the fact that Appellant had repeatedly lied to the officers who spoke with him, i.e., an explanation other than that he was trying to avoid being arrested for burglary:

> The reason why, he know [sic] his history is bad. Every interaction that he's had with a cop has led him to prison. They randomly come up to him and ask him, ["]Hey, what's your name?["] The cop try [sic] to befriend him, all that. And he's like, ["]No, I don't know what you're talking about.["]

Lead counsel's cross-examination followed up on this theme when he questioned one of the officers on the nervous reactions of persons with a prior criminal history to police interaction.

Lead counsel was dealt a poor hand in trying to explain why Appellant had lied to the police. Lead counsel's strategy was to use bad facts that were already before the jury (and would continue to be) to some advantage. Further, although lead counsel could have been asked at the hearing on the motion for new trial about his strategy in making the argument, he was not. Thus, we assume that counsel made a reasonable strategic decision to acknowledge the bad facts that Appellant's case presented. *See Robertson*, 187 S.W.3d at 483 ("A convicted defendant making a claim of ineffective

26

assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.").

And, undoubtedly, mentioning criminal history can have a strategic purpose. *Martin v. State*, 265 S.W.3d 435, 443–45 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding that because it appeared "that [defendant's] candor before the jury concerning his prior convictions was a strategic attempt to appear open and honest, and to lessen the impact of any impeachment on the issue, we cannot conclude that his counsel provided ineffective assistance with regard to the introduction of these convictions"). If the core of Appellant's argument is that lead counsel's statement was of a different magnitude because he acknowledged that Appellant had gone to prison, that argument is unpersuasive. It is a reasonable assumption that prior convictions for felonies had led to prison time. How this reasonable assumption would taint Appellant more than the open fact that he was a convicted felon is unexplained.

Next, Appellant claims that his lead counsel's questioning was deficient because "[b]ut for trial counsel's actions, the jury never would have known Appellant had an additional five warrants." Co-counsel for Appellant had asked a hypothetical question about warrants while cross-examining an officer. One of her questions obtained an admission that the officer sometimes interacts "with people who have warrants[,] and sometimes [the person] give[s] . . . a false name to try to avoid incarceration." There is no claim that this question was an example of ineffective assistance of counsel. It appears to have been part of the attempt to rationalize Appellant's deceptive statements.

Then the following exchange occurred during lead counsel's cross-examination of another officer and was followed by an off-the-record discussion:

Q. Okay. And -- and we see on the video that [Appellant], now that y'all got him pinpointed, and we know and y'all know that he had a -- he had a criminal record at the time, were you also aware of the warrants that he had at the time too as well?

A. At what time are you referring to?

Q. When you first --

[PROSECUTOR]: Your Honor, may we approach?

THE COURT: Yes, you may.

The question was asked in support of the contention that police had rushed to judgment. At the hearing on the motion for new trial, Appellant's counsel asked whether there had been a bench conference after the question quoted above and whether counsel was told during the conference that information about warrants was not admissible. Though counsel was also asked if he then turned cross-examination over to co-counsel, the record indicates that lead counsel continued the cross-examination.

Counsel's purpose in asking the question was obviously part of the strategy of explaining Appellant's deceptive conduct and challenging the investigation that led to his arrest. The mention of warrants may have been a misstep, but all the record contains is the mention without any confirmation that Appellant had outstanding warrants. Apparently, no information about outstanding warrants was ever presented to the jury;

28

Appellant's brief acknowledges that "[t]he State did not play for the jury any portions of the [body-cam videos] that mentioned the warrants during trial, and [the State] specifically avoided asking questions about the warrants." Thus, Appellant wants us to accept that the passing reference to warrants in a question so prejudiced his rights because "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." As with most of his arguments, the question of prejudice is not addressed by Appellant, other than to offer a conclusion that he was irreparably harmed. We will not re-catalog the evidence of Appellant's guilt. Instead, we simply conclude that the passing reference to warrants—when placed in the context of the evidence of Appellant's guilt and his own admissions about his criminal history—did not create a reasonable probability that but for the reference to warrants the factfinder would have had a reasonable doubt regarding Appellant's guilt.

### E. We reject Appellant's claim that counsel's objection to a portion of a body-cam video constituted ineffective assistance of counsel.

Appellant's next argument is a variation on his prior theme that counsel failed to suppress the video excerpt in which the officer asked him why he had changed shirts. Appellant's tack in this argument is no more persuasive than his first effort.

Appellant begins this argument with the premise that "it is ineffective assistance of counsel to permit the admission of prejudicial and inadmissible evidence that has no strategic value." The alleged error that Appellant now highlights is as follows:

> Trial counsel objected to the State['s] publishing [E]xhibit 12 to the jury after the exhibit had already been previously admitted without objection,

29

which makes no procedural sense. Specifically, the prosecution moved to admit Exhibits 9 through 11 in full then Exhibit 12 subject to stipulations, and trial counsel responded, "No objections, your Honor." [M]ere moments later, the State sought to publish the admitted exhibits to the jury[,] and trial counsel objected for the first time because "[we're trying to see what's the probative value to this—of them basically playing—you know, playing this portion." Trial counsel proceeds to summarize what he expects the video will show but never makes a proper legal objection into the record. The court ultimately overruled trial counsel's objection because it was not timely lodged or stated in proper legal form. [Record references omitted.]

This act allegedly shows that lead counsel's conduct confirms that he should have filed a motion to suppress and that when he "tried to object after the exhibit had already been admitted by the court," it shows that "trial counsel has no grasp of basic criminal procedure and the rules of evidence."

The State argues that counsels' acts reveal the counter of what Appellant claims because the record as a whole does not show that his counsels' performance was deficient. The State highlights that "counsel was familiar enough with the evidence to make sure that portions favorable to Appellant were also played for the jury" and that "[c]ounsel made numerous objections at trial that were sustained and did an able job cross-examining the State's witnesses with a focus toward painting the police investigation as an inadequate rush to judgment."

We reject Appellant's argument for different reasons. The argument turns on the unaddressed premise that a futile motion to suppress should have been filed—an argument that we have already addressed. It also turns on the premise that permitting the question and answer about changing shirts created the requisite level of prejudice

30

to sustain an ineffective-assistance-of-counsel claim—another argument that we have rejected.

**F.     We reject Appellant's claim that a failure to object to proof of one of Appellant's prior convictions constituted ineffective assistance of counsel.**

Appellant's next argument is that lead counsel failed to object to inadmissible evidence by permitting Appellant to stipulate to a couple of prior convictions when grounds existed to object to the admission of those convictions. The usual two-prong *Strickland* analysis applies to an ineffective-assistance-of-counsel claim made during the punishment phase. *West v. State*, 474 S.W.3d 785, 794 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("As with the guilt[–]innocence phase of trial, the standard [of ineffective assistance of counsel in the punishment phase] is the two-pronged *Strickland* test." (citing *Hernandez v. State*, 988 S.W.2d 770, 771 (Tex. Crim. App. 1999))).  Once more, Appellant's argument fails because he ignores the burden of proving ineffective assistance.

Appellant signed a stipulation that listed twenty-plus prior judgments.  During the punishment phase, the prosecution offered an indictment and two judgments of conviction dated February 2018 that were included in the stipulation.  When offered, lead counsel objected to the admission of the three exhibits because the convictions did not contain a thumbprint.  The State noted that the convictions had been listed on the stipulation.   When asked if the defense wanted the exhibits removed from the stipulation, lead counsel responded, "Yes, Your Honor.  Because my client doesn't

simply remember those charges. He remembers being charged with another crime. There's no thumbprint on it." When Appellant came to this revelation and why he signed the stipulation if he disagreed with its contents was not discussed. The State expressed some irritation with the objection because it had made the judgments available to the defense back when lead counsel took over the case.

The objection resolved itself when the State's counsel announced, "[I]t's my understanding [that] they are not revoking their stipulation now on [the offered exhibits]" and that "all stipulations on [the stipulation exhibit] are current." Lead counsel was asked about the chain of events at the new-trial hearing, but nothing was asked about why the objection had been lodged at that particular point in the trial or why it was withdrawn.

The record provides no insight regarding why Appellant had signed a stipulation referencing the exhibits at issue in the first place if he had concerns about whether the information about certain convictions was correct. Nor do we know when he first told counsel that he did not remember the convictions that were in the stipulation exhibit that he had signed. We do not know if he sprang information on counsel as the exhibits were being introduced and if counsel then had to respond to the information on the spur of the moment. "An ineffective-assistance claim must be 'firmly founded in the record, and 'the record must affirmatively demonstrate' the meritorious nature of the claim." *Gomez v. State*, 552 S.W.3d 422, 432 (Tex. App.—Fort Worth 2018, no pet.) (quoting *Thompson*, 9 S.W.3d at 813). In other words, "[a] vague, inarticulate sense that

32

counsel could have provided a better defense is not a legal basis for finding counsel constitutionally incompetent." *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). Here, we have no idea if counsel missed the fingerprint issue or if his client raised the issue suddenly when he reconsidered the wisdom of his stipulation.

Beyond this, the objection was eventually withdrawn. Again, we do not know why. At the end of the day, the stipulation that Appellant had signed remained unchanged. Thus, the foundation of the argument—that lead counsel permitted invalid convictions before the jury—is unsupported; Appellant makes no attack on the ultimate decision to withdraw the objection.

Further, even if we assume the deficient performance that Appellant alleges, his argument still fails. For example, the San Antonio Court of Appeals dealt with a claim of ineffective assistance when counsel permitted a defendant to plead true to enhancement allegations even though there were defects in the pen packet that made the prior conviction inadmissible. *Baxter v. State*, No. 04-04-00606-CR, 2005 WL 2367569, at *1 (Tex. App—San Antonio Sep. 28, 2005, pet. ref'd) (mem. op., not designated for publication). *Baxter* noted, as does the State in its brief, that a prior conviction may be proven by putting together the jigsaw puzzle.[6] Under these

---

[6]The Tyler Court of Appeals recently described the jigsaw approach as follows:

"To establish that a defendant has been convicted of a prior offense, the State must prove beyond a reasonable doubt that (1) a prior conviction exists . . . and (2) the defendant is linked to that conviction." *Henry v. State*,

circumstances, we do not presume the State was without means of proving the conviction and will not reverse on a theoretical claim of prejudice. *Id.* at \*2; *see Harrison v. State*, 950 S.W.2d 419, 422–23 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd)

---

509 S.W.3d 915, 918 (Tex. Crim. App. 2016); *see also Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007).

Evidence of a certified copy of a final judgment and sentence accompanied by fingerprint expert testimony may be a preferred and convenient means, but the State may use other types of evidence to prove an enhancement. *Henry*, 509 S.W.3d at 918. Examples of acceptable evidence include the admission or stipulation of the defendant, testimony by people present at the time of the defendant's conviction and who can identify the defendant as the person convicted, and documentary proof [that] contains sufficient information to establish that a prior conviction exists and the defendant's identity as the person convicted. *See id.*

With respect to documentary proof, no specific document or mode of proof is required to prove these two elements. *Flowers*, 220 S.W.3d at 921. In proving prior convictions, identity often includes the use of a combination of identifiers, and each case is to be judged on its own individual merits. *Littles v. State*, 726 S.W.2d 26, 32 (Tex. Crim. App. 198[7]) (op. on reh'g). The totality of the circumstances determines whether the State met its burden of proof. *Flowers*, 220 S.W.3d at 923. The proof that is adduced to establish that the defendant on trial is one and the same person that is named in an alleged prior criminal conviction or convictions closely resembles a jigsaw puzzle. *Human v. State*, 749 S.W.2d 832, 836 (Tex. Crim. App. 1988)[ (op. on reh'g]. The pieces standing alone usually have little meaning. *Id.* However, when the pieces are connected, they usually form the picture of the person who committed that alleged prior conviction or convictions. *Id.* "The trier of fact fits the pieces of the jigsaw puzzle together[,] . . . weighs the credibility of each piece[, and] . . . determines if these pieces fit together sufficiently to complete the puzzle." *Flowers*, 220 S.W.3d at 923.

*Wiseman v. State*, No. 12-23-00198-CR, 2024 WL 3533081, at \*4 (Tex. App.—Tyler July 24, 2024, pet. ref'd) (mem. op., not designated for publication).

(rejecting argument similar to Appellant's that the State would not have been prepared to prove convictions without appellant's cooperation because that assumption was "not firmly founded in the record"); *see also Risher v. State*, No. 01-18-00625-CR, 2020 WL 1264183, at *3–4 (Tex. App.—Houston [1st Dist.] Mar. 17, 2020, no pet.) (mem. op., not designated for publication) (citing principle of *Harrison* to reject ineffective-assistance claim based on appellant's claim that he had pleaded true to a defectively proven prior conviction).

And finally, to establish ineffective assistance during the punishment phase of trial, an appellant must "prove that there is a reasonable probability that, but for counsel's errors, the sentencing jury would have reached a more favorable verdict." *Ex parte Rogers*, 369 S.W.3d 858, 863 (Tex. Crim. App. 2012) (quoting *Ex parte Cash*, 178 S.W.3d 816, 818 (Tex. Crim. App. 2005)). "It is not enough to show that trial counsel's error had some conceivable effect on the outcome of the punishment assessed." *Id.*

Appellant's argument also ignores the elephant in the room: even if evidence of the two convictions in question were excluded, there remained evidence that Appellant had a host of other convictions to which he makes no challenge. Appellant never explains his calculus regarding why there is a reasonable probability that he was more prejudiced by proof of the host of prior convictions than he was by the host of prior convictions plus the two that he claims should have been excluded. *See Donald v. State*, 543 S.W.3d 466, 485, 487 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (op. on reh'g) (failure to object to evidence of an unadjudicated offense was not prejudicial in

35

light of evidence that appellant had sixteen prior convictions). And as the State highlights, at least in one regard, the jury was lenient in sentencing; on the felon-in-possession charge, the jury assessed a minimum punishment of twenty-five years out of a range of "not less than twenty-five (25) years[] but not more than ninety-nine (99) years or Life." In view of Appellant's admitted copious criminal history and the punishments assessed, we cannot conclude that the alleged error supports a reasonable probability that the jury would have reached more favorable verdicts on punishment had the alleged error not occurred.

### G. We reject Appellant's claim that we must conclude that his counsels' actions deprived him of a "fair and just" trial.

Appellant's final argument is a scattergun criticism of his trial counsel that is offered to sustain his theme that their inexperience deprived him of a "fair and just" trial. Again, Appellant cherry picks his criticisms and avoids an examination of the totality of the record, understandably avoiding how that analysis undermines his ineffective-assistance claim. But a challenge to the trial court's exercise of its discretion in overruling his motion for new trial cannot be based on such a one-sided analysis.

Turning to the first specific argument, Appellant claims that co-counsel's inexperience manifested itself when she made invalid hearsay objections and ignored the introduction of testimony that constituted hearsay. As an example of Appellant's crabbed view, he cites one page of the record for this conclusion but ignores that on the prior page, the trial court impliedly sustained a hearsay objection by telling the

prosecutor to rephrase her question. Appellant's true point, however, is that co-counsel's actions were evidence of what she had said in the declaration filed in support of Appellant's motion for new trial; she felt that she and lead counsel were inexperienced, unprepared, and in over their heads, which she had indeed said. But Appellant ignores that co-counsel also signed an affidavit with a tone that defended her representation.[7] This left the trial court to decide which of co-counsel's representations was correct and her motives for her later declaration.

---

[7]The following are statements from co-counsel's affidavit:

**2.** *Refusal to Allow Testimony of Other Witnesses*
The client did not offer any credible witnesses to be presented at trial. During the trial, one witness came forward unexpectedly. However, after speaking with the witness and reviewing [her] account, I found that [her] testimony did not align with the facts of the case. I did not believe presenting this witness would be in the client's best interest, as it could have undermined our defense. Additionally, presenting a witness I did not find credible would have violated my ethical duties as counsel, and thus I did not call this witness to testify.

**3.** *Failure to Call Witnesses or Present a Defense Case*
Given the circumstances, no credible witnesses were available or viable for presentation at trial. There was no defense case that could be put forward that would meaningfully benefit the client, and after consultation with lead counsel, we decided not to present a defense.

**4.** *Failure to Object to Unlawfully Obtained Evidence*
I zealously objected to various lines of questioning from the prosecution throughout the trial. I was even admonished by the presiding Judge for objecting on multiple occasions. Nevertheless, I made a good[-]faith attempt to challenge any unlawfully obtained evidence presented at trial.

**5.** *Failure to Correct False Impressions from Body[-]cam Evidence*

37

And the fact remains that both lead counsel and co-counsel made appropriate objections that were sustained; conducted lengthy cross-examinations of the witnesses; and made arguments at the guilt–innocence stage (filling eighteen pages of the record) that challenged whether the State had carried its burden of proof, that brought forward the theme that Appellant was arrested in a rush to judgment, and that explained why Appellant had acted as he did when speaking with the officers. It was the trial court's job—and is now our job—to determine if counsels' alleged errors "had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary

The body[-]cam evidence included statements made by the client that were damaging to the defense. It was not possible for me to correct or explain the client's statements without further prejudicing the client's position. I made the strategic decision not to address these points in a way that could have further implicated the client.

**6.** *Failure to Review Evidence and Prepare for Trial*
I reviewed all of the evidence made available to me by the prosecution and lead counsel prior to trial. Although time was limited due to the late notice of the trial date and meeting the client only the week before, I thoroughly examined the materials I was provided.

**7.** *Failure to Counter Misrepresentations of Extramarital Affair*
The client admitted to having extramarital affairs, which was recorded on body[-]cam footage. As these statements came directly from the client, it was not possible for me to counter or correct the impression left with the jury. I did, however, do my best to mitigate the damage from these statements by redirecting focus to other elements of the defense.

**8.** *Failure to Object to Improper Evidence or Argument*
Throughout the trial, I zealously objected to various lines of questioning and evidence presented by the prosecution. Despite being admonished by the presiding Judge at times, I made a good[-]faith effort to challenge any improper and irrelevant evidence or arguments presented by the State.

picture" or merely "had an isolated, trivial effect" and to answer that question in the context of the strength of the case against Appellant. *See Walker*, 676 S.W.3d at 220–22. With that standard in mind, we reject Appellant's claim of ineffective assistance predicated on co-counsel's alleged misunderstanding of what constituted hearsay.

Next, Appellant targets one episode of lead counsel's actions by claiming that his objection to the jury charge demonstrated that he "did not understand that the prior convictions on the [b]urglary of a [v]ehicle with two prior convictions and the [u]nlawful [p]ossession of a [f]irearm were jurisdictional elements of the crimes[] and [that] the State needed to prove them to the jury beyond a reasonable doubt." The State counters as follows:

> But [Appellant's conclusion] is not at all obvious from the record – counsel noted that they had already stipulated to the convictions, and so he did not desire for [the] jury's attention to be unduly drawn to them. There is no indication that counsel did not understand the jurisdictional nature of the enhancements. At the hearing on the motion for new trial, trial counsel explained his reasoning that he simply did not want to draw attention to it, and Appellant did not make any showing at that hearing that trial counsel misunderstood the jurisdictional nature of the enhancements. As noted above, this [c]ourt should not engage in speculation about whether the State could have proved the enhancement allegations without Appellant's cooperation. [Record references omitted.]

We agree with the State.

Appellant's final argument again ignores the big picture and thus turns a blind eye to the question of the effectiveness of the overall representation that Appellant received. The narrow emphasis of Appellant's argument is demonstrated by this summation:

39

> The most difficult task on an ineffective[-assistance-]of[-]counsel claim is that the appellate court must give trial counsel an opportunity to give their side of the story and explain the[ir] decisions, which rarely happens on a direct appeal. But this [c]ourt has the benefit of reviewing a record that includes two sworn statements from [co-counsel] that basically admit that the defense team was too inexperienced and unprepared for trial.[8]

Appellant follows up on this argument by once again (1) asking us to pillory lead counsel's credibility because his representation to the trial court at the motion-for-new-trial hearing—that he had reviewed the body-cam videos before trial—is not believable and (2) arguing that we are compelled to believe that the lawyers were unprepared to try this case.

Like many of Appellant's characterizations, he assumes that we should accept this characterization at face value. That effort ignores the role of the trial court to determine credibility as part of the exercise of its discretion, and the record is not so one-sided that we can say that the trial court erred if it accepted lead counsel's representation. *See In re A.J.R.B.*, No. 10-24-00177-CV, 2024 WL 5088043, at *3 (Tex. App.—Waco Dec. 12, 2024, no pet.) (mem. op.) ("In evaluating the trial court's exercise of discretion, we defer to the trial court's resolution of underlying facts and credibility determinations, and we do not substitute our own judgment in its place." (citing *In re Vogel*, 261 S.W.3d 917, 925 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding)). We assume that the trial court resolved this fact question contrary to Appellant's

---

[8]We disagree with Appellant's characterization of co-counsel's affidavit and have already noted its tone of defending the representation that Appellant was provided and the uphill battle that counsel faced.

position. *See Sandifer*, 2016 WL 7157249, at *4. Further, the trial court had lead counsel's testimony, its own recollection of both counsels' trial performance, and the state of the record as the basis of its exercise of its discretion in denying the motion for new trial.

Appellant's ongoing failure to acknowledge the range of the information before the trial court and to address the impact of a big picture created by the totality of counsel's performance and the strength of the evidence supporting the jury's decision remains the base failing of his ineffective-assistance contention. The requirement that we consider the big picture is why we disagree with Appellant's contention that "[t]he most difficult task on an ineffective[-assistance-]of[-]counsel claim is that the appellate court must give trial counsel an opportunity to give their side of the story." Actually, the most difficult task in an ineffective-assistance-of-counsel claim is establishing that the quality of the representation—though flawed in some respects—had a reasonably probable impact on the result.

We have carefully analyzed and summarized the record. Though counsels' representation may have been imperfect, they fought hard and developed effective themes in an effort to blunt a difficult set of facts. Beyond this, the fundamental question is again the pervasive effect of errors, with that question being directly influenced by how strong the evidence of guilt is and whether we can reasonably conclude that counsels' errors influenced the punishment meted out. We will not rehash the evidence. But the fact remains that Appellant's counsels' true challenge was

41

not of their creation but a result of the strong evidence of their client's guilt and his voluminous criminal history. At the end of the day, Appellant's effort is flawed because it ignores the burdens that he is required to carry to establish from the totality of the record *both* deficient performance and a resulting prejudice. The trial court did not abuse its discretion by overruling Appellant's motion for new trial, and our de novo review—conducted with deference to the trial court's factual determinations—confirms the propriety of the trial court's ruling.

We overrule Appellant's sole issue in his supplemental brief.

## H.    We sustain Appellant's challenge to the assessment of witness-summoning fees.

In the first issue in his original brief, Appellant expends six pages challenging a $55.00 fee assessed for serving eleven subpoenas. The clerk's record in this matter contains a bill of cost showing an "amount" of $55.00 assessed for "Subpoena service fee." Appellant argues that the fee assessment is invalid because the subpoenas were not properly served. We will sustain the challenge.

There is no question that the Code of Criminal Procedure provides for the assessment of a $5.00 cost when a peace officer summons a witness. *See* Tex. Code Crim. Proc. Ann. art. 102.011(a)(3) ("A defendant convicted of a felony or a misdemeanor shall pay the following reimbursement fees to defray the cost of the services provided in the case by a peace officer: . . . $5 for summoning a witness . . . ."). Appellant also concedes that the record indicates that the subpoenas were served by an

investigator for the Denton County District Attorney's office. These investigators are "peace officers." *See id.* art. 2A.001(5) ("The following are peace officers: . . . an investigator of a district attorney's, criminal district attorney's, or county attorney's office . . . .").

Though Appellant acknowledges that there is a statutory basis for a fee to summon witnesses and that the ones serving the subpoenas were peace officers, he still challenges the assessment. Appellant argues that the fee is not valid because the subpoenas themselves did not contain valid returns of service, and for this reason, service was never validly performed.

Some of the subpoenas were served by certified mail, which is a valid method of serving a subpoena. *Id.* art. 24.04(a)(4) (stating that a subpoena is served by "mailing a copy of the subpoena by certified mail, return receipt requested, to the last known address of the witness"). But Appellant contends that the mailed subpoenas were not actually served by certified mail because they had defective returns; he argues that the return should have contained a proper return receipt. *See id.* art. 24.04(b) ("The officer having the subpoena shall make due return thereof, showing . . . the return receipt, if served under Subsection (a)(4) of this article.").

Appellant makes a similar argument with respect to the subpoenas served electronically. For those, he claims that the returns were defective because they lacked an acknowledgement of receipt. *Id.* ("The officer having the subpoena shall make due return thereof, showing . . . the acknowledgment of receipt, if served under Subsection

43

(a)(3) of this article . . . ."). He also argues that the form of the electronically served subpoenas was defective because they lacked a required notice of how their receipt must be acknowledged. *Id.* art. 24.04(c) ("A subpoena served under Subsection (a)(3) of this article must be accompanied by notice that an acknowledgment of receipt of the subpoena must be made in a manner enabling verification of the person acknowledging receipt.").

And Appellant argues that we should review his challenge to the $55.00 cost assessment though he raises it for the first time on appeal. By making this argument, he does not explain why he did not avail himself of the remedy that he had to correct any error in the costs in the trial court. *See id.* art. 103.008(a) ("On the filing of a motion by a defendant not later than one year after the date of the final disposition of a case in which costs were imposed, the court in which the case is pending or was last pending shall correct any error in the costs."). He also ignores the question that we outline below regarding whether the record shows how the amount of the assessment was computed and whether we can conclusively determine that the assessment is incorrect on the basis of the record that we have. Instead, he merely claims that "[a] defendant may challenge the costs imposed in a bill of cost[] for the first time on appeal when the costs are not imposed in open court and the judgment does not contain an itemization of the costs" and cites *London v. State*, 490 S.W.3d 503, 507 (Tex. Crim. App. 2016).

Under the present state of the law, we will review the challenge. *See Ikemere v. State*, 716 S.W.3d 179, 184 (Tex. App.—Houston [14th Dist.] 2025, no pet.).[9] The Fourteenth Court has recently followed its precedent to allow a challenge to a witness-summoning fee raised for the first time on appeal and has rejected the reasoning of an opinion now withdrawn by the First Court of Appeals that disagreed with *Ikemere* that the cost challenge could be raised for the first time on appeal. *See Abad v. State*, No. 14-24-00818-CR, 2025 WL 3759507, at *5–6 (Tex. App.—Houston [14th Dist.] Dec. 30, 2025, no pet. h.) (rejecting analysis of *Sotelo v. State*, Nos. 01-24-00562-CR, 01-24-00567-CR, 2025 WL 2312273, at *6 (Tex. App.—Houston [1st Dist.] Aug. 12, 2025, no pet.) (op. withdrawn and corrected opinion issued Sept. 9, 2025).

---

[9]*Ikemere* explained the basis for the decision to review the matter for the first time on appeal as follows:

> The Court of Criminal Appeals has classified the peace-officer reimbursement statute as a "mandatory cost," i.e., a cost that is a "predetermined, legislatively mandated obligation imposed upon conviction." *Johnson v. State*, 423 S.W.3d 385, 389 (Tex. Crim. App. 2014) (citing Tex. Code Crim. Proc. [Ann.] arts. 102.001–.022). Such court costs "are not part of the guilt or sentence of a criminal defendant, nor must they be proven at trial." *Id.* at 390. Thus, "we review the assessment of court costs on appeal to determine if there is a basis for the cost, not to determine if there was sufficient evidence offered at trial to prove each cost" under a traditional evidence-sufficiency standard. *Id.* Nonetheless, a reviewing court may be asked to determine whether "the assessed court costs are supported by facts in the record." *Id.* at 395. An appellant may bring a "challenge to a specific cost or basis for the assessment of that cost." *Id.* at 396.

716 S.W.3d at 185.

The Fourteenth Court of Appeals in *Abad* looked to the form of the returns on the subpoenas and concluded that there were defects in the returns and held that these defects meant that the subpoenas did not "comply with the statute"; on that basis, it struck the fee assessed. *Id.* at *9 ("Of the 10 subpoenas [served electronically] that appellant identifie[d] as containing an incorrect email address, four do not comply with the statute because the returns do not reflect acknowledgment of receipt. We therefore conclude that the fees for these four subpoenas should not have been assessed against appellant.").

Here, Appellant also identifies defects in the returns. We conclude that these defects reflect a failure to comply with Article 24.04. We therefore delete the challenged $55.00 fee assessed for summoning witnesses.

We sustain Appellant's first issue in his original brief.

## I.    We reject Appellant's claim that we should delete the bills of cost because he does not owe costs until released from confinement.

In the second issue in his original brief, Appellant argues that we should modify the bills of cost issued by the district clerk "to remove the not-yet-payable costs." Later, Appellant argues that the bills of cost should be deleted in their entirety. His rationale is that the issuance of a bill of cost makes it immediately payable, and if the bill is immediately payable, that circumstance violates the trial court's judgments, which specify that Appellant is not obligated to pay or make arrangements to pay costs until

46

he is released from confinement. We reject his argument but will slightly modify the bills of cost.

Here, the judgments provide that "[u]pon release from confinement, the Court ORDERS [Appellant] to proceed without unnecessary delay to the District Clerk's office, or any other office designated by the Court or the Court's designee, to pay or to make arrangements to pay any fine, court costs, and restitution due." The district clerk issued a bill of cost after each judgment.

Appellant initially argues that Article 103.001(b) of the Code of Criminal Procedure makes the bills of cost immediately payable. In its specific terms, Article 103.001(b) provides that "a cost is not payable by the person charged with the cost until a written bill containing the items of cost is[] (1) produced[,] (2) signed by the officer who charged the cost or the officer who is entitled to receive payment for the cost[,] and (3) provided to the person charged with the cost." Tex. Code Crim. Proc. Ann. art. 103.001(b).

In an opinion that we have already cited, the Fourteenth Court of Appeals recently rejected the same argument that Appellant raises. *See Abad,* 2025 WL 3759507, at *10. *Abad* described the mechanism of Article 103.001 as simply making costs "payable." *Id. Abad* went on to explain why it rejected an argument that its prior precedent created an "obligation" to pay the costs included in the bill:

> In *Jones*[ *v. State*], we held[ that] "[b]ecause the bill of cost[] obligates appellant to pay the items listed, we reject the State's argument that we are without jurisdiction to modify the bills of cost in this case." [691 S.W.3d

671, 679 (Tex. App.—Houston [14th Dist.] 2024, pet. ref'd).] Appellant, adding the phrase, "upon issuance," argues that the costs are paid immediately when the bill of cost[] issues.

Nothing in [A]rticle 103.001 or in the bill of cost[] in our record reflects that appellant is required to immediately pay the costs. A bill of cost[] becomes payable when it has been produced, signed, and provided to the person charged with the cost. Tex. Code Crim. Proc. [Ann.] art. 103.001(b). The bill of cost[] does not specify a timeline for paying costs. The bill of cost[] lists the amounts payable by appellant, and the judgment specifies when appellant must pay those amounts. The judgment may make those payments payable immediately upon the bill of cost[] being produced, signed, and provided to defendant or it may, as it did here, make those payments payable at a later date. Thus, there is no conflict between the bill of cost[] and the judgment. *See Jones v. State*, No. 14-24-00474-CR, 2025 WL 2446555, at *6 (Tex. App.—Houston [14th Dist.] Aug. 26, 2025, pet. ref'd) (not designated for publication) (concluding the bill of cost[] and judgment did not conflict).

*Id. Abad* concluded that the record before it did not indicate that the trial court had intended for its appellant to pay costs during his incarceration. We see no indication of that intent—for Appellant to pay costs during incarceration—in our record and conclude that Appellant, as was the appellant in *Abad*, "is not obligated to pay the assessed costs and fees until he is released from confinement." *Id.* Thus, we decline Appellant's invitation to delete the bills of cost in their entirety.

To ensure that there is no ambiguity in the record, this court has previously modified bills of cost to specify that costs are not due until an appellant is released from confinement. *See Flores v. State*, No. 02-24-00413-CR, 2025 WL 3039149, at *7–9 (Tex. App.—Fort Worth Oct. 30, 2025, no pet.) (mem. op., not designated for publication); *Pippin v. State*, No. 02-24-00444-CR, 2025 WL 2088330, at *3 (Tex. App.—Fort Worth

48

July 24, 2025, no pet.) (mem. op., not designated for publication); *Ramirez v. State*, No. 02-24-00224-CR, 2025 WL 1350046, at *2 (Tex. App.—Fort Worth May 8, 2025, no pet.) (mem. op., not designated for publication). Accordingly, we modify the bills of cost in case numbers F24-1463-362 and F23-3731-362 in accordance with the language in the trial court's judgment to include a statement that the assessed costs and fees are not payable by Appellant until his release from confinement.

Other than the modification to the bills of cost specified above, we overrule Appellant's second issue in his original brief.

## IV. Conclusion

We have overruled the issues raised in Appellant's supplemental brief, and we have sustained the first issue and have overruled the second issue raised in Appellant's original brief. Thus, we affirm the trial court's judgments with the following exceptions: (1) modifying the bill of cost in case number F23-3731-362 to delete the $55.00 "Subpoena service fee" and (2) modifying the bills of cost in case number F24-1463-362 and in F23-3731-362 to include a statement that the assessed costs and fees are not payable by Appellant until his release from confinement.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: January 30, 2026

49